# In the United States Court of Federal Claims

No. 10-427C
(Filed: April 21, 2011)

```
* * * * * * * * * * * * * * * * * *  *
                                     *
JENNIFER PABLO,                      *
                                     *  "Bad Men" claim; Fort Sumner
              Plaintiff,             *  Treaty of 1868, arts. I, II, IX, XIII,
                                     *  June 1, 1868, 25 Stat. 667; Fort
       v.                            *  Laramie Treaty of 1868, art. I, Apr.
                                     *  29, 1868, 25 Stat. 635; Member of one
THE UNITED STATES,                   *  tribe seeking rights off-reservation or
                                     *  under treaty of another tribe
              Defendant.             *
                                     *
* * * * * * * * * * * * * * * * * *  *
```

*Robin Leonard Zephier*, Rapid City, SD, for plaintiff.

*John Hunter Bennett,* United States Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant. *Kara Pfister*, United States Department of the Interior, Office of the Solicitor - Twin Cities, Fort Snelling, MN, of counsel

**O P I N I O N**

**FIRESTONE**, *Judge*.

This case arises out of an incident involving sexual abuse of a young Indian girl, F.C. (also known as "F.W.") by a police officer, Daniel Kettell ("Officer Kettell"). The plaintiff, Jennifer Pablo, is the mother and guardian <u>ad litem</u> of F.C. The plaintiff's amended complaint alleges that the attack on F.C. by Officer Kettell falls under the terms of the first "bad men" clause of Article I of the Fort Sumner Treaty of June 1, 1868

between the Navajo Nation and the United States, 15 Stat. 667 ("Fort Sumner Treaty"). Article I provides, in part, "If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will . . . reimburse the injured persons for the loss sustained." Fort Sumner Treaty at art. I.[1] The plaintiff seeks compensatory damages from the defendant, the United States,[2] in the amount of $2,000,000 for various injuries stemming from the attack that the plaintiff alleges will require future medical, rehabilitative, and psychological counseling, treatment, and therapy. The plaintiff also seeks costs, attorney's fees, and all other damages permitted by the Fort Sumner Treaty.

The government has moved for summary judgment in its favor pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The government argues that F.C. was not residing or located in the Navajo Reservation at the time of the attack and therefore under Article XIII of the Fort Sumner Treaty she was not entitled to any of the privileges or rights conferred by the treaty at the time of the attack, including the protections of the "bad men" clause. Article XIII of the Fort Sumner Treaty provides, in part, "it is further agreed and understood by the parties to this treaty, that if any Navajo

---

[1] Article I of the Fort Sumner Treaty includes two "bad men" clauses, the first dealing with wrongs committed <u>upon</u> Navajos and the second dealing with wrongs committed <u>by</u> Navajos. This case is brought pursuant to the former.

[2] In the plaintiff's amended complaint she makes a claim for damages against Daniel Kettell as the officer who attacked her daughter. Under the Tucker Act, "if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court." <u>United States v. Sherwood</u>, 312 U.S. 584, 588 (1941). Accordingly, to the extent the plaintiff has alleged claims against Daniel Kettell, those claims are **DISMISSED** for lack of jurisdiction.

Indian or Indians shall leave the reservation herein described to settle elsewhere, he or they shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty." Fort Sumner Treaty at art. XIII.

For the reasons that follow, having reviewed the parties' briefs and after hearing oral argument, the court **GRANTS** the government's motion.

## I. BACKGROUND

For the purposes of the defendant's motion for summary judgment, the following facts are not in dispute.

On the evening of July 5, 2008, Officer Kettell, a law enforcement officer on the Rosebud Sioux Indian Reservation and a member of the Sioux Tribe, arrested F.C. on suspicion of drinking alcohol while underage and began transporting her to the Rosebud Sioux Tribe Law Enforcement facility. Officer Kettell was employed by the Rosebud Sioux Tribe but had been issued a special law enforcement commission that allowed him to enforce applicable federal criminal laws in Indian country. Def.'s Corrected Mot. to Dismiss Pl.'s Compl. in Part & for Summ. J. 18, ECF No. 9. While in route to the facility, Officer Kettell physically and sexually abused, molested, and assaulted F.C. and took compromising photos of her on a cell phone. The attack took place on the Rosebud Sioux Indian Reservation, while Officer Kettell was employed as a police officer with Rosebud Sioux Law Enforcement Services.

Following the attack, Officer Kettell was charged with one count of abusive sexual

contact in violation of federal law. Officer Kettell pled guilty in the United States District Court for the District of South Dakota and was sentenced to two years in prison and ordered to pay a fine.

On the date of the attack, F.C. was not an enrolled member of any Indian tribe. However, there is no dispute that on the date of the attack, indeed since the day she was born, F.C. was an "Indian person" and was eligible to be enrolled in a federally recognized Indian Tribe. Specifically, F.C. was eligible to be enrolled in either the Navajo Tribe or the Three Affiliated Tribes of North Dakota Indians. Her mother, Jennifer Pablo, is an enrolled member of the Eastern Navajo Tribe in New Mexico. Her father, Guy Colombe, is an enrolled member of the Three Affiliated Tribes of North Dakota Indians.[3] F.C. is currently enrolled as a member of the Navajo Nation.

F.C. was born on the Rosebud Sioux Indian Reservation on November 3, 1993. At the time of the attack, she was living with her father in the Ring Thunder Community on the Rosebud Sioux Reservation. She also occasionally stayed with her grandparents, who lived in Mission, South Dakota, which is also located on the Rosebud Sioux Reservation. There is no dispute that the Rosebud Sioux Reservation is outside of the boundaries of the

---

[3] The Three Affiliated Tribes (Mandan, Hidatsa, and Arikara) are separate from the Sioux tribes that signed onto the Fort Laramie Treaty of April 29, 1868 between the Great Sioux Nation and the United States, 15 Stat. 635 ("Fort Laramie Treaty"). See Fort Laramie Treaty; see also Steven J. Gunn, Compacts, Confederacies, & Comity: Intertribal Enforcement of Tribal Court Orders, 34 N.M. L. Rev. 297, 327 nn.196-97 (2004) (noting that the Three Affiliated Tribes are non-Sioux tribes, though they have in recent years signed onto the Dakota Territory Chairmen's Council, an inter-tribal legislative body that serves as the modern day National Sioux Council).

reservation recognized by the Fort Sumner Treaty.

Prior to filing her "bad men" claim in this court, the plaintiff submitted an administrative claim to the Bureau of Indian Affairs ("BIA") seeking $5,000,000 in damages pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680. The Rosebud Sioux Tribe provides law enforcement services for the Rosebud Sioux Reservation pursuant to a contract with the United States Department of the Interior. Def.'s Corrected Mot. to Dismiss Pl.'s Compl. in Part & for Summ. J. 17, ECF No. 9. The contract provides, "For purposes of FTCA coverage, the Contractor and its employees . . . are deemed to be employees of the Federal government while performing work under this contract." Id. at 18 n.12. According to the plaintiff, the government has not of yet responded to the merits of that claim, although the claim is still pending. The plaintiff does not seek relief pursuant to the FTCA in the instant case.

In the plaintiff's original complaint, she alleged that the attack fell under the terms of the first "bad men" clause of Article I of the Fort Laramie Treaty, which states:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also re-imburse the injured person for the loss sustained.

Fort Laramie Treaty at art. I.

In the plaintiff's amended complaint she now alleges that the attack on F.C. by

Officer Kettell falls under the nearly identical terms of the first "bad men" clause of the Fort Sumner Treaty, which states:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

Fort Sumner Treaty at art. I.

In addition to Article I, the Fort Sumner Treaty also provides, "the tribes who are parties to this agreement hereby stipulate that they will relinquish all rights to occupy any territory outside their reservation, as [defined in Article II[4]]." Fort Sumner Treaty at art. IX. It further states:

> The tribe . . . agree[s] to make the reservation, herein described, their

---

[4] Article II of the Fort Sumner Treaty states:

The United States agrees that the following district of country, to wit: bounded on the north by the 37th degree of north latitude, south by an east and west line passing through the site of old Fort Defiance, in Canon Bonito, east by the parallel of longitude which, if prolonged south, would pass through old Fort Lyon, or the Ojo-de-oso, Bear Spring, and west by a parallel of longitude about 109 degrees 30' west of Greenwich, provided it embraces the outlet of the Canon-de-Chilly, which canon is to be all included in this reservation, shall be, and the same is hereby, set apart for the use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them; and the United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employees of the Government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

Fort Sumner Treaty at art. II.

> permanent home, and they will not as a tribe make any permanent settlement elsewhere . . . and it is further agreed and understood by the parties to this treaty, that <u>if any Navajo Indian or Indians shall leave the reservation herein described, he or they shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty</u>.

<u>Id.</u> at art. XIII (emphasis added).

Pursuant to Article XIII, the government has moved for summary judgment, arguing that F.C.'s injuries are not covered by the Fort Sumner Treaty because the wrong was committed off the Navajo Reservation while the plaintiff was living on the Rosebud Sioux Reservation.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Casitas Mun. Water Dist. v. United States</u>, 543 F.3d 1276, 1283 (Fed. Cir. 2008); <u>Telemac Cellular Corp. v. Topp Telecom, Inc.</u>, 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 249. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d at 1283.

## B. Review of Indian Treaties

Treaties are to be liberally construed in favor of Indians. Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 194 n.5 (1999); McClanahan v. State Tax Comm'n, 411 U.S. 164, 174 (1973) ("'[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith'") (quoting Carpenter v. Shaw, 280 U.S. 363, 367 (1930)). Review of the history and the negotiations is central to the interpretation of Indian treaties. Mille Lacs, 526 U.S. at 202; Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 774 (1985) (viewing plain language in historical context); Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675-76 (1979) (interpreting Indian treaties in light of the purpose of the treaty negotiations and the language of the treaties); Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-432 (1943) ("we may look beyond the written word to the history of the treaty, the negotiations, and the practical construction adopted by the parties"). The Treaty must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians. Mille Lacs, 526 U.S. at 196, 206 ("we interpret Indian treaties to give effect to the terms as the Indians themselves would have

understood them."). "[T]he resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506 (1986); see also Choctaw Nation, 318 U.S. at 432 ("Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties"); Confederated Band of Ute Indians v. United States, 330 U.S. 169, 179 (1947) ("While it has long been the rule that a treaty with Indians is to be construed so as to carry out the Government's obligations in accordance with the fair understanding of the Indians, we cannot, under the guise of interpretation . . . rewrite congressional acts so as to make them mean something they obviously were not intended to mean.").

## III. DISCUSSION

The single issue now before the court is whether the alleged injuries to F.C. give rise to a claim for compensation under the "bad men" clause of the Fort Sumner Treaty, where the victim's permanent residence was outside the boundaries of the Navajo Reservation recognized by the Fort Sumner Treaty and where the victim was attacked outside the boundaries of the Navajo Reservation recognized by the Fort Sumner Treaty.[5]

---

[5] The Federal Circuit has described the history surrounding the Fort Sumner Treaty as follows:

The treaty in question is one of nine made in 1868, by and between commissioners representing the United States and chiefs of various previously hostile Indian tribes. The treaties were all duly ratified, proclaimed, and published in volume fifteen of the Statutes at Large. All say that peace is their object and all contain "bad men" articles in similar

This same issue was addressed under similar facts in an earlier case, <u>Herrera v. United States</u>, 39 Fed. Cl. 419 (1997), <u>aff'd</u> 168 F.3d 1319 (Fed. Cir. 1998). <u>Herrera</u> also involved a claim brought under the "bad men" clause of the Fort Sumner Treaty that resulted from a physical attack on the plaintiff, a Navajo Indian, by an Indian of a different tribe. <u>Id.</u> at 420. In that case, the attacker was a fellow student at the plaintiff's boarding school. <u>Id.</u> At the time of the attack the plaintiff's permanent domicile was an allotment of land outside the Navajo Reservation boundaries and the plaintiff resided temporarily in a school dormitory that was also located on land outside the reservation boundaries. <u>Id.</u> Having found that the plaintiff was not attacked on the reservation and that he did not reside on the reservation, the court held as follows:

> Articles IX and XII[I] effectively restrict the Treaty rights and privileges of

---

language. The Navajo treaty, 15 Stat. 667, was made at Fort Sumner, New Mexico. . . . [T]he Navajos had been at war with the United States in 1863, and being defeated, were detained thereafter as prisoners of war at Fort Sumner.

<u>Tsosie v. United States</u>, 825 F.2d 393, 395 (Fed. Cir. 1987). The Circuit further explained the inclusion of the first "bad men" clause as follows:

> [The Navajos] feared attacks by other Indian tribes, which they could repel, but pursuit and retaliation it was hoped they would refrain from, leaving that to the United States Army. The "bad men" clause dealing with wrongs <u>to</u> the Navajos is not confined to United States Government employees, but extends to "people subject to the authority of the United States." This vague phrase, to effectuate the purpose of the treaty, could possibly include Indians hostile to the Navajos whose wrongs to Navajos the United States will punish and pay for: thus the need for Indian retaliation would be eliminated.

<u>Id.</u> at 396. Upon review of the legislative history, the Circuit noted that the text of the "bad men" clause suggested that in addition to "whites" any "other people" (i.e. "nonwhites") can be "bad men" if they are "subject to the authority of the United States." <u>Id.</u> at 400. "Lt. General Sherman . . . suggested the meaning of 'nonwhites' in the following statement during the negotiations: If you will live in peace with your neighbors, we will see that your neighbors will be at peace with you – The government will stand between you and other Indians and Mexicans." <u>Id.</u> at 400 n.2.

> Article I to those Navajo living on a reservation contemplated by Article II of the Treaty. [Plaintiff] may only assert a claim for compensation under the Treaty if plaintiff's permanent residence was located within the boundaries of the reservation recognized by the Treaty.  Because [plaintiff] did not live on the reservation and the attack occurred outside the reservation's boundaries, [plaintiff] is not entitled to the protections afforded by the Treaty.

Id. at 420; see also Tsosie, 825 F.2d at 396 ("The Navajos agreed to stay on their reservation and to occupy no other land, but were allowed to hunt elsewhere.").

In the instant case, the plaintiff attempts to distinguish the facts of this case from the facts of Herrera by arguing that the victim of the attack in this case was born on, was residing on, and was attacked on a reservation recognized by the Fort Laramie Treaty, which contains a nearly identical "bad men" clause to that in the Fort Sumner Treaty. Compare Fort Laramie Treaty at art. I, with Fort Sumner Treaty at art. I.  The plaintiff argues that the court should construe the "bad men" clause of the Fort Sumner Treaty together with the "bad men" clause of the Fort Laramie Treaty so as to afford the protections of either treaty to any Indian person, including F.C., who is within the boundaries of the reservations recognized by either treaty.  Pl.'s Resp. 6-7, ECF No. 21. To interpret the Fort Sumner Treaty otherwise, the plaintiff argues, would be to leave F.C. with no protection under either Treaty.

The government does not dispute that F.C. was born on, was residing on, and was attacked on a reservation recognized by the Fort Laramie Treaty.  However, the government argues that for the purposes of Article XIII of the Fort Sumner Treaty, this difference in facts does not distinguish this case from Herrera.  Accordingly, the

government argues that it is entitled to summary judgment that the alleged injuries to F.C. do not give rise to a claim for compensation under the "bad men" clause of the Fort Sumner Treaty, where both victim's permanent residence and the location of the attack were outside the boundaries of the Navajo Reservation recognized by the Fort Sumner Treaty.

The court agrees with the government. As stated in Herrera, there is nothing ambiguous about the text of the Fort Sumner Treaty in this regard:

> The term "reservation" is unambiguous. The loss of rights provision of article XIII of the Treaty is equally unambiguous. It is also clear under article IX that the tribes relinquished all rights to occupy territory outside the reservation contemplated by the agreement.

Herrera, 39 Fed. Cl. at 421. The plaintiff has provided no additional evidence to support its interpretation of the treaty language as demonstrating an intent on the part of the parties to extend the Treaty's protections beyond the boundaries of the reservation recognized in Article II of the Treaty. Article XIII clearly strips a Navajo of the rights conferred by the bad men clause if he or she permanently settles outside the boundaries of the reservation recognized by the Treaty. Moreover, as the Federal Circuit noted in Tsosie, at the time the Treaty was signed, the Navajos "feared attacks by other Indian tribes," and in the Treaty negotiations Lt. General Sherman expressed an intention that "The government will stand between you and other Indians." Tsosie, 825 F.2d at 396, 400 n.2. The court has been presented with nothing in the Treaty history to indicate that either the Navajos or the United States intended for there to be an exception in the Fort

Sumner Treaty for a Navajo who moves to another Indian reservation recognized in another Treaty with another Indian tribe, even where that treaty contains a nearly identical "bad men" clause. It is not appropriate for this court to create an ambiguity in the Treaty where none exists, and the court declines to do so here.[6]

Finally, the court notes that this plaintiff is not without avenue for redress of F.C.'s injuries. As stated previously, prior to filing her "bad men" claim in this court, the plaintiff submitted an administrative claim to the BIA seeking $5,000,000 in damages pursuant to the FTCA. The proper forum for an FTCA claim is a United States district court. 28 U.S.C. § 1346(b)(1). Under 28 U.S.C. § 1346(b)(1), United States district courts have exclusive jurisdiction to hear tort claims against the United States, including all FTCA claims. See id. An FTCA claim may proceed in a district court after the

---

[6] In addition, the plaintiff cannot rely upon Article I of the Fort Laramie Treaty to preserve her "bad men" claim, because F.C. is not, and was not at the time of the attack, eligible to become a member of one of the tribes protected under the Fort Laramie Treaty. At oral argument, counsel for the government explained that in order for F.C. to have been eligible to become an enrolled member of the Rosebud Sioux Tribe, she must have had at least one parent who was an enrolled member of the Rosebud Sioux Tribe. See Rosebud Sioux Tribal Const. art. II, § 1(c) ("All persons that can provide three (3) generations of lineal descent born after April 1, 1935, to a member of the Rosebud Sioux Tribe, regardless of the residence of the parent.") (emphasis added); Id. art II, § 2 ("The Tribal Council shall have the power to promulgate ordinances covering future membership and the adoption of new members."). Counsel for the plaintiff conceded that F.C. was not born to a parent who is an enrolled member of the Rosebud Sioux Tribe, but responded that there have been some exceptions to this rule, such as adoption by a member of the Rosebud Sioux Tribe. Counsel for the plaintiff suggested that the court might consider F.C.'s birth on the Rosebud Sioux Reservation, her residency on the Rosebud Sioux Reservation at the time of the attack, and the fact that she frequently lived with her grandparents, who are members of the Rosebud Sioux Tribe, together as evidence that she may have been eligible to become an enrolled member of the Rosebud Sioux Tribe. The court is not in a position to create exceptions to the enrollment requirements of the Rosebud Sioux Tribe, and the plaintiff has provided no evidence to suggest that an exception was made by the Rosebud Sioux Tribal Council to make F.C. eligible for enrollment. Accordingly, the court finds that the plaintiff has alleged no facts indicating that F.C. was ever enrolled or eligible to be enrolled as a member of the Rosebud Sioux Tribe.

claimant presents her FTCA claim to the appropriate federal agency and the agency issues a final decision denying her claim. 28 U.S.C. § 2675(a). The failure of an agency to make final disposition of a claim within six months after it is filed is deemed a final denial of the claim at the option of the claimant any time thereafter. See id.

## IV. CONCLUSION

Having found no factual dispute material to the question of whether the plaintiff may recover under the Fort Sumner Treaty, the court enters judgment for the government. No costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge